Argued May 8, affirmed September 11, 1970

UNION BOND AND TRUST COMPANY ET AL,
*Plaintiffs-Appellants, v.* M AND M WOOD
WORKING COMPANY ET AL, *Defendants-
Respondents,* HULL, *Defendant-Appellant.*
474 P2d 339

*George L. Wagner*, Portland, argued the cause for plaintiffs-appellants. With him on the briefs were McColloch, Dezendorf, Spears & Lubersky and James C. Dezendorf, Portland.

*LaVerne M. Johnson*, Corvallis, argued the cause for defendant-appellant. With him on the briefs were Thomas & Johnson, Corvallis.

*Richard K. Bush*, Seattle, Washington, argued the cause for defendants-respondents. With him on the brief were Sabin, Newcomb, Sabin & Meyer, and Roger L. Meyer, Portland, and Ryan, Carlson, Bush, Swanson & Hendel, Seattle, Washington.

Before McALLISTER, Presiding Justice, and SLOAN, O'CONNELL, DENECKE, TONGUE and HOWELL, Justices.

TONGUE, J.

This is a suit in equity for specific performance of a contract for the sale of timber, with an alternative demand for $11,000,000 as damages for breach of that contract. After 21 days of testimony a decree was entered in favor of defendants M and M Wood Working Company and Simpson Redwood Company. Plaintiffs appeal, as does defendant Ralph Hull, who was also named as a defendant.

The original complaint was filed on December 1, 1961, by Union Bond and Trust Company ("Union") and A. K. Wilson, and alleges that Union is the successor and assignee of the rights of Ralph Hull under an agreement dated June 16, 1951, between Ralph Hull, Hull Redwood Lumber Co. and Manila Mills Co. (referred to collectively as "Hull") and defendant M and M Wood Working Company ("M and M"). Plaintiffs seek to enforce the right of Ralph Hull under that agreement to purchase 250,000,000 board feet of redwood timber in Northern California from M and M at a price of $6 per thousand board feet (per M) and

allege that the timber was reasonably worth $50 per M at the time of the filing of their complaint.[1]

Plaintiffs contend that "the central issue in this case" is whether M and M acted improperly and in bad faith in refusing to consent to an assignment by Ralph Hull to Union of his rights under the June 1951 agreement to purchase the redwood. Thus, plaintiffs assign as error the finding by the trial court that in refusing such consent M and M did not act improperly or in bad faith. Plaintiffs also assign as error the holding of the trial court that M and M had the right to terminate that agreement, including Hull's right to purchase the redwood timber. Finally, plaintiffs assign as error the holding of the trial court that plaintiffs' claim is barred by laches.[2]

Defendant Ralph Hull contends that if Union did not acquire the right to purchase the redwood timber by assignment from him, then he still has the right to purchase that timber.

*Written Agreements Between Parties.*

(1) *April 14, 1951, Agreement Between Union and Hull.*

By the terms of an agreement dated April 14, 1951, between Union and Hull, Union agreed to sell and Hull agreed to buy certain timber lands in Northern California (referred to in this case as the "Hull tract") together with a mill, a remanufacturing plant

---

[1] In 1956 defendant Simpson Redwood Company acquired the business, properties and assets, and assumed the liabilities of defendant M and M Wood Working Company.

[2] Plaintiffs' principal contentions will be described in more detail in the course of this decision.

and certain equipment, supplies and inventories, for which Hull agreed to make payments as provided by that contract. In addition, Union granted to Hull an option until June 17, 1951, to purchase a second tract (referred to in this case as the "M and M tract") for the purchase price of "approximately" $2,000,000, computed at $6 per M of timber according to a cruise attached to that agreement. At that time, however, Hull did not have funds available to exercise this option.

(2) *June 16, 1951 Agreement Between M and M and Hull—Limitation on Assignment.*

On June 16, 1951, the day before the expiration of the option, Hull entered into an agreement with M and M, under which M and M paid to Union the sum required for the exercise by Hull of the option to purchase the M and M tract, in return for a deed to that tract. By separate agreement it was also provided, among other things, that:

(a) Hull would deliver and sell to M and M all fir peeler logs cut from the Hull tract at the market price prevailing at the time of delivery. (M and M then had a plywood mill nearby and was interested in maintaining a supply of fir peeler logs.)

(b) Commencing in 1956, and continuing for an estimated period of 15 years, M and M would sell and deliver to Ralph Hull all redwood logs from the M and M tract at a price of $6 per M (plus logging costs), payable in minimum annual payments of $90,000 beginning on December 31, 1956. In the event that M and M failed to deliver 18,000,000 board feet in any year Hull was granted the right to enter and cut redwood timber from that tract, but not fir timber—M and M retaining the sole right to log all fir timber, of which there was also a considerable quantity.

Because the M and M tract was located across the Klamath River from the Hull tract and without then-existing practical logging access roads, Hull also agreed, among other things, to grant to M and M "any and all rights-of-way or easements it is capable of giving and granting on and across the Hull tract for the purpose of providing access to the M and M tract."

The contract also provided that the parties were to agree upon a logging program for the M and M tract at the beginning of each year and that since it was impossible to foresee all contingencies, the parties "must necessarily contemplate fair dealings between them based upon mutual trust and confidence." Finally, the agreement included the following provision limiting Hull's right to assign his interests under that agreement:

> "It is understood that M and M is entering into this agreement because it has full trust and confidence in the integrity and ability of Ralph Hull, and accordingly it is agreed that this agreement may not be assigned without the prior written consent of M and M nor by operation of law, except to heirs at law or devisees of Ralph Hull * * *. It is agreed, however, that M and M will not unreasonably withhold consent to any assignment by Ralph Hull if the assignee is a person or corporation in which M and M has confidence and can reasonably expect to carry out the terms of this agreement on the part of Ralph Hull to be kept and performed by him."

(3) *December 3, 1951 Agreement Between Union and Hull to Assign Hull's Rights Under the June Agreement to Union.*

On December 3, 1951, a further agreement was entered into between Union and Ralph Hull. This was

after Union had terminated its April agreement with Hull and his corporations for defaults under that agreement and after Hull's corporations had gone into bankruptcy. By the terms of the December 1951 agreement the April agreement was terminated and cancelled and exclusive possession of the Hull tract was redelivered to Union, thus also terminating Hull's capacity to produce and sell fir peeler logs from that tract to M and M, as required by the June 1951 agreement. Paragraph 12(b) of the December agreement also provided for the assignment to Union of Hull's rights under the June 1951 agreement, conditioned upon consent by M and M to the assignment.[9] As previously indicated, the primary issue in this case is whether M and M acted improperly and in bad faith in refusing such consent.

---

[9] "Hull agrees to assign to Union all of the right, title and interest of Hull in and to and under that certain agreement dated the 15th day of June, 1951, by and between Hull and M and M Wood Working Company, subject, however, to the express condition precedent that the written consent of M and M Wood Working Company be first obtained. In this connection Hull agrees not to in any way or in any manner, directly or indirectly, interfere with, hinder or delay, or take any action or do any thing inconsistent with the obtaining of such consent of said M and M Wood Working Company, and Hull agrees to execute such documents as may be necessary, requested by Union, to effect such assignment and/or consent, and if Union determine to institute any proceeding or action in respect thereof, Hull hereby grants to Union the irrevocable power and authority to bring such proceeding or action in the name of Hull and/or in his behalf, at the sole cost and expense of Union, and Union shall pay any costs taxed against Hull in any such proceeding. Hull agrees that such assignment is and will be reasonable and that Union is a person who can reasonably be expected to carry out the terms of said agreement on the part of Hull to be kept and performed. Union agrees to perform all of the duties and obligations of Hull under said agreement, provided, however, that if such consent is not or cannot be obtained, then, at the option of Union and thirty days after written notice thereof to Hull, or if the option herein granted to Hull in paragraph 11 is exercised, Union's obligations thereunder shall forthwith cease and terminate."

I  *M and M Did Not Improperly or in Bad Faith With-
hold its Consent to the Assignment.*

*Plaintiff's Contentions.*

The principal facts relied upon by plaintiffs in
support of their contention that M and M acted im-
properly and in bad faith in refusing to consent to an
assignment to Union of Hull's rights under the June
agreement to purchase the redwood timber may be
summarized as follows:

(1) Evidence that M and M had previously been
willing to do business with Wilson (owner of Union);
that all of such prior dealings had been satisfactory in
all respects and that Wilson was recognized to be a
"good logger."

(2) Documentary evidence that at the time of the
June 16, 1951 agreement, Tom Malarkey, president of
M and M, entered into inconsistent letter agreements
with both Wilson and Hull, under which both of them
were promised the right to purchase the redwood tim-
ber at $6 per M in the event of Hull's default under
his April 1951 agreement with Union.

(3) Written reports and letters showing that
early in July 1951, M and M developed a sudden in-
terest in "getting into redwood;" that in September
Tom Malarkey recognized that "it would be advan-
tageous" to have the June agreement with Hull "cease
to exist" because M and M could then have the red-
wood "by ourselves;" that in October he reported that
"almost any buyer" of Hull's interest in the June 1951
agreement "would be questioned by us," and that in
seeking to keep the redwood "we are simply trying to
vastly improve our position because of Hull's diffi-
culties."

(4) Further documentary evidence showing that after Union terminated its April agreement with Hull and made the December 3, 1951 agreement with Hull, under which he agreed to assign to Union his rights under the June agreement, M and M not only refused to accept delivery of fir peeler logs by Union from the Hull tract or to enter into any temporary agreement for the delivery of such logs, but terminated the June 1951 agreement with Hull, and that when Union then requested its consent to the assignment M and M immediately notified Union of its refusal to consent and did so without convening its Board of Directors to consider that request.

In considering the probative weight to be given to the foregoing evidence, however, it is necessary to consider such facts in the context of the entire series of transactions between all of the parties involved in this case.

*History of Transactions Between Parties.*

(1) *Dealings Between M and M and Wilson Prior to June 1951.*

Some years prior to 1951, M and M had on some occasions engaged Wilson as a logger in Oregon and had purchased logs from him. These transactions had been completed by Wilson as agreed and Wilson was at that time regarded by M and M as a "good logger."

(2) *The Two Inconsistent Letter-Proposals dated June 16, 1951.*

The first of these letters was the result of a request by Mr. Hull. As a result of that request, Tom Malarkey, president of M and M, gave Hull a letter,

dated June 16, 1951, reciting that Hull had "requested a modification" of the terms of the agreement of June 16, 1951, to the effect that in the event that Hull defaulted in his April agreement with Union relating to the Hull tract, and "to protect" Hull's rights to the timber in the M and M tract (i.e., to purchase the redwood timber on that tract for $6 per M), Hull should be given the privilege of supplying from other sources the 15 million feet of fir peeler logs that he would otherwise have supplied to M and M from the Hull tract and would "join with M and M" in the cost of securing an alternate access road to the M and M tract. The letter went on to state, however, that Mr. Malarkey was "not authorized—without Board approval —to alter the proposed agreement which we are about to execute," but that he would submit Hull's "proposition" to the Board "with my recommendation for approval."

Later, on June 16, 1951, Mr. A. K. Wilson, as president of Union, met with Tom Malarkey, as president of M and M, to close the transaction under which M and M was to pay $1,917,372 to Union in return for a deed to the M and M tract and Union was to consent to the assignment to M and M of Hull's right under his April 1951 agreement with Union to cut timber from the Hull tract. At that time Wilson presented Mr. Malarkey with a letter, to be signed by him, under which Mr. Malarkey also would agree to submit to the M and M Board of Directors, with his "favorable recommendation," a proposal by Union that in the event that Hull defaulted under the April agreement, M and M would "make with us an agreement on the same terms" as with Hull "respecting the redwood on the lands" (i.e., that M and M would sell the redwood timber from the M and M tract to Union at $6 per M and grant Union

the same logging rights on that tract as previously granted to Hull).

At the time of trial Mr. Malarkey freely conceded that the two letters were inconsistent and that he did not inform either Hull or Wilson of the proposal made by the other. With respect to the Hull letter he testified that, as he viewed the matter on June 16, 1951, Mr. Hull was trying to get a further concession which had not been previously agreed upon and was not included in the terms of the proposed agreement as previously drafted in final form, and as approved and authorized by the M and M Board at a meeting on June 13, 1951, but before it was signed by the parties, and that he made it clear to Hull that while he would recommend such a concession to the Board, it would be for the Board to decide whether or not to approve it.

With respect to the Union Bond letter he testified that it was not presented by Mr. Wilson until the final meeting for the closing of the transaction; that at that time he "did not relate one to the other;" that he then briefly discussed the letter with one of the attorneys for M and M, "and asked my attorney's opinion. He said O.K.;" that he was not "trying to mislead" and was not then conscious of the inconsistency between the two letters, but signed the letter presented by Wilson with the understanding that it was for the M and M Board to decide whether to approve the proposal, as expressly stated in the letter.

The Hull proposal was never submitted to the M and M Board for consideration. Mr. Malarkey testified that there was no occasion to do so, apparently because the matter was "dropped by Hull," as found by the trial court. Indeed, on July 16, 1951, the June 16 agreement was modified in another respect, but with

no reference to the change proposed by the letter to Hull dated June 16.

There was considerable testimony, however, that the Wilson proposal was submitted to the M and M Board of Directors and was rejected by it. Although the testimony was not clear as to the date when the Union proposal was considered by the M and M Board of Directors, several members of the Board testified that Tom Malarkey presented the Union proposal to the Board with his recommendation (as he had agreed to do), and the trial court so found. There was also considerable testimony that this proposal was flatly rejected by the Board after various individual members of the Board expressed strong views to the effect that Wilson (the owner of Union) was an untrustworthy, litigious, "wheeler-dealer" with an unsavory reputation and that they did not want to do business with him as a "partner" under a long term contract of the size and nature of the June 1951 agreement. It also appears from the evidence that Mr. Tom Malarkey, although president, was not one of the larger stockholders and that Mr. Herbert Malarkey, who was the largest stockholder, opposed the proposal, as also did Board members who were not members of the Malarkey family, but had considerable experience in the lumber industry.

(3) *Development of Interest by M and M in Retaining Redwood Lumber. Notices of Default by Union to Hull and Attempted Repossession.*

Thus, Union contends that the "basic evidence" of the "design" of M and M to "capture" the redwood timber for itself started with a letter dated July 9, 1951, to Tom Malarkey from his brother Neil, one of

the M and M attorneys, in which it was stated that Hull was having difficulties under his April agreement with Union and might "fold up," and that "while Hull is struggling along further investigations should be made" whether M and M should "take over" his contract with Union and also "whether M and M wants to go into the redwood lumber business."

It appears, however, that on July 5, 1951, Hull had informed M and M that he had received numerous default notices from Union; that although he had cured any such defaults he expected to receive more default notices; that Union had not delivered to him the Compton plant, as necessary for him to generate the funds to make contract payments; and that he was being subjected to "harassing tactics" by Union.

Tom Malarkey, and also Robert Sabin, M and M's attorney, testified that they were shocked and indignant at this treatment of Hull by Wilson and that they concluded that Wilson had "embarked on a campaign to destroy Mr. Hull in a business way, and keep his million dollars." At that time M and M apparently still regarded the redwood market as "very shaky" and "speculative," according to the same letter dated July 9, 1951 to Tom Malarkey from his brother Neil, who recommended, however, that M and M investigate the redwood "situation."

Tom Malarkey then made a trip to California, during which he interviewed a number of people in the lumber business. He testified that "several of them said, very emphatically, that he (Wilson) was a crook;" that "he was litigious and that anybody who had any business dealings with him would sooner or later wind up in court and have a great deal of trouble."

Mr. Malarkey reported the results of his investi-

gation to the M and M Board at its meeting on July 26, 1951. At that meeting the consensus of the Board was that M and M was not interested in acquiring the interests of Hull under his contract with Union. In August, however, the M and M Board expressed interest in acquiring a redwood mill and decided to hold its September meeting in Eureka, California.

Union also relies upon evidence that on September 14 Tom Malarkey expressed the view in a telephone conversation, in which Hull's problems were discussed, that "it would be advantageous" to M and M to have Hull's contract with Union "cease to exist" because M and M would then have the "M and M tract by ourselves."

At about that same time Hull informed M and M that he had received additional default notices and that although he had cured the defaults claimed by Union he expected to receive "more default notices in the immediate future." Hull's attorney testified that in his opinion the April agreement between Union and Hull had been "drawn with the deliberate purpose of making it impossible for Mr. Hull to perform" and that he considered these default letters "a typical Wilson operation under a timber contract."

A meeting was then held on October 2, 1951, between attorneys for Hull and M and M to explore the possibility of working the matter out. At that time Hull's attorney informed M and M of some of the problems which he and his clients had experienced with Wilson involving "sharp," and otherwise improper logging and business practices and of Wilson's bad reputation in the lumber industry in that area. At the conclusion of that meeting, according to the testimony, Hull's attorney was told by the attorney for M and M

that it did not want to become involved in a deal that would involve it with Wilson and Union, but might be willing to pay $100,000 for Hull's right to purchase the redwood from the M and M tract.

On October 12, 1951, Hull's attorney called Tom Malarkey to say that Hull would not accept that offer. On the same date Hull filed a petition for arrangements with creditors under Chapter XI of the Federal Bankruptcy Act for Ralph Hull Lumber Company and Manila Mills Company. The previous day, October 11, 1951, and again on October 12, Union mailed to Hull a Notice of Election to Terminate the April 14 agreement with Hull. At the same time Union attempted to repossess the Hull tract and other properties being purchased by Hull under that agreement, "like any good red blooded American would do," as testified by Wilson.

On October 18, 1951, Tom Malarkey prepared a report to the M and M Board reviewing these developments and stating, among other things, that "warm feelings toward Hull have somewhat cooled since he abruptly turned his back to a fair offer;" that Wilson was "frothing at the mouth" and would "demand the right to repossess his properties," and that:

"(1) Our contract with Hull states that he can only dispose of his contract to a responsible buyer. So far, we have inferred that almost any buyer would be questioned by us. Any prospective purchaser who might be buying a law suit as well as a property, might think twice.

"(2) We are on the alert to detect any deviation or default from our contract with Hull. Once detected, notice of default and/or termination will follow quickly."

and that:

"* * * if by some device Hull works out of his difficulties, we'll simply be back where we started, to wit: That he has the refusal of our redwood at $6.00 per thousand. After all, we are simply trying to vastly improve our position because of Hull's difficulties."

During this same period the M and M Board discussed the possibility of purchasing a redwood mill and authorized Tom Malarkey to "ascertain the most favorable terms" on which M and M could acquire such a mill. Tom Malarkey then made a further report to the M and M Board on November 17, 1951, in which he did not recommend "any action" other than to consider acquisition of the Hull tract (presumably as the result of further negotiations with Hull), and referring to "our projected program of redwood liquidation," as well as to the possibility that Simpson Industries might "jump at the chance" of an assignment from Hull. The report goes on to state:

"* * * our contract with Hull provides that he can transfer his contract to a 'reasonable' buyer. We would be hard put to challenge the responsibility and capacity of Simpson Industries * * *.

"* * * * *

"Conceivably, Simpson could take over the West side tract, force us to acknowledge them as a buyer of Hull's contract with M and M, and we would be eliminated from the redwood picture entirely in the Blue Creek and Ah Pah Creek drainages."

(4) *Negotiation of Agreement December 3, 1951 for Assignment to Union of Hull's Right to Purchase and Log Redwood—Refusal by M and M to Consent to Assignment.*

Meanwhile, during the period from late October to December 1951, Union and Hull were engaged in

negotiations for termination of their April agreement and the assignment by Hull to Union of his rights under the June agreement with M and M. During that period a series of some 20 complete or partial drafts of a proposed agreement on this subject were prepared by Union's attorneys.

During these negotiations Hull informed Wilson that he did not expect M and M to consent to an assignment to Union of his rights under the June agreement. It is obvious, however, that Union wanted to repossess the Hull tract, even though in doing so it might be obligated to sell the fir peeler logs to M and M (as that agreement required Hull to do), and that Union also wanted to acquire Hull's rights under that agreement to purchase the redwood from the M and M tract at $6 per M. It is also obvious, for these same reasons, that extreme care was exercised to draft an agreement in such a manner that would not provide a basis on which M and M could either refuse to consent to an assignment to Union of the June agreement with Hull or terminate that agreement.

The result was to negotiate, draft and sign a 30 page contract dated December 3, 1951, which not only terminated the April agreement between Hull and Union and provided for repossession of the Hull tract by Union, but also included a provision in the form of an agreement *to assign* Hull's rights under the June agreement to Union subject, however, to the *"express condition precedent* that the written consent of M and M be first obtained." It was also provided that Hull would not interfere with the obtaining of such consent and to such an assignment; that *"such assignment is and will be reasonable and that Union is a person who can reasonably be expected to carry out the terms of*

*that agreement* on the part of Hull to be kept and performed."[4]

On the contrary, however, Hull and his attorney had both previously informed M and M that Union and Wilson had been guilty of harassing tactics to force Hull out of business; that they had a bad reputation in the lumber industry in that area, and that they were not persons to whom M and M could reasonably be expected to consent to such an assignment.

M and M was not immediately notified of the execution of the December 3 agreement by either Union or Hull, nor was its consent to an assignment immediately requested by either of them. On December 6, 1951, however, after being informed that Union had taken over Hull's logging operations and had tendered to M and M the delivery of fir peeler logs from the Hull tract, M and M wrote to Wilson to determine his intentions, stating that while it was obligated to buy the peeler logs from Hull, it would purchase them from Wilson "if and when Mr. Hull's interest in the timber is legally terminated." Upon receiving no response, M and M then sent to Wilson a telegram and letter that no more logs would be received unless some understanding was reached as to the basis upon which they were being offered by Union; that Hull had advised that he had "assigned the contract to you" and had surrendered the Hull tract to Wilson; and that M and M did not consent to the assignment, but would purchase logs from Wilson if sold without any contention that they were delivered "in conformity with Hull's contract or as an assignee."

On December 11, 1951, Hull notified M and M that it had signed an agreement with Union, dated De-

---

[4] For full text of this contract provision, see note 3, *supra.*

cember 3, 1951, and sent M and M a copy of its provisions relating to assignment of the June agreement. On the same day M and M informed Hull that it did not consent to the assignment; that it appeared that Hull had put himself "in a position where you cannot possibly perform your obligations; that Wilson is removing logs from the timber lands," and that "we assume that we are now entitled to terminate the contract but are awaiting a copy of your contract with Wilson so that we will be fully informed before taking action." On the same date M and M also again wrote to Wilson that it did not consent to the assignment and requested that logs dumped by Wilson to the M and M log pond be removed.

On December 19, 1951, Union submitted to M and M a letter in the form of a proposed agreement, reciting that by the December 3 agreement Hull had surrendered to Union possession of and all rights in the Hull tract; that he had also agreed to assign to Union his June agreement with M and M "subject to an express condition precedent that has not occurred," but that as yet there had been "no assignment or even a request to M and M for consent to an assignment," and proposing a temporary arrangement under which M and M would purchase logs from the Hull tract without such purchase being "construed as consent by it to an assignment."

On December 28, 1951, the M and M Board of Directors met. According to the minutes of that meeting, it appears that Mr. Sabin, M and M's attorney, made a "detailed report" on the matter, including the proposed letter agreement, and that "the consensus was that the agreement be signed after revision in a manner satisfactory to the corporations attorneys." At the same meeting a report was read by Tom Ma-

larkey on "redwood operations," discussing the shortage of redwood lands and the problems, advantages and profits to accrue from either purchasing or building a redwood mill in California. A motion was then unanimously adopted to "get into the redwood business," by "such means as might seem advisable."

On that same day (December 28th) Mr. Sabin talked with Mr. Wilson by telephone, stating that the M and M Board had objections to the proposed letter agreement dated December 19, 1951. Mr. Wilson then wrote to M and M asking it to prepare and submit "a form of agreement satisfactory to you." That letter was apparently not received by Mr. Sabin until after he wrote a further letter to Mr. Wilson's attorney on the following day, December 29, 1951, stating that M and M would not accept the previously proposed letter agreement dated December 19 for the reason that what Hull had done, including the surrender of possession to Union of the "Hull tract, amounts to a complete assignment," putting M and M in the position that it could not acquire logs from the Hull tract on a permanent basis or for "more than a temporary period" unless it agreed to the assignment. The letter went on, however, to refer to discussions with Wilson in which it was indicated that he might "see whether he could work out an acceptable proposal."

On the same date Mr. Sabin wrote to Hull and to his attorney with notice that M and M considered Hull to be in default of his obligations under his June agreement with M and M (for reasons discussed more fully below) and demanding that such defaults be cured within 30 days. In the letter to Hull it was stated, among other things, that:

"Throughout your difficulties with Union we have told you that we would not consent to an assign-

ment to Mr. A. K. Wilson or any of his corporations and you have agreed that we could not be reasonably asked to do so * * *."

On January 7, 1952, after returning from a trip to California, Mr. Sabin wrote a further letter to Mr. Wilson acknowledging Wilson's letter of December 28, stating that:

"As I told you in our last telephone conversation, the M and M Woodworking Company will be pleased to buy the logs from you if the purchase in no manner alters Mr. Hull's rights, if any, under his contract with the M and M dated June 16, 1951, and if it does not give you or any of your corporations an interest in that contract or recognize any rights thereunder you may claim to have.

"Our understanding was that you would discuss the situation with your attorney and submit a new proposal. Under the circumstances, I do not see why the M and M should prepare and submit an agreement as requested, but will give the matter careful consideration."

However, on January 9, 1952, he wrote a further letter to Wilson stating that "we have complied with your request and enclose an agreement in a form that would be satisfactory to this company" (M and M).

On the same date, however, by a telegram from Wilson to M and M which was apparently sent before receiving Sabin's letter, Wilson stated that "it now appears that you do not intend to make such an agreement" and, for the first time, requested that M and M consent to the assignment.

M and M responded two days later by letter from Tom Malarkey to A. K. Wilson dated January 11, 1952, reviewing the negotiations, confirming its previous notice that it would not consent to the assignment and stating, among other things:

"* * * At the meeting of our Board next follow-

ing the execution of the contract (in June, 1951), the problems that would arise if Hull should default were discussed at my instance, and the Board was firmly of the opinion that it would not accept you as a successor. Hull was so advised long before he agreed to assign to you. It is apparent that he was forced to make that agreement when he was in danger of losing his life's savings in his ill-advised adventure with you.

"Frankly, we feel no legal or moral obligation to accept you as a successor to Mr. Hull. We do not think the arrangement would work out well for either of us. You are getting all the property back from Hull that you sold him. We paid you your full price in cash for the property we purchased."

By letters dated January 11 and February 1, 1952, M and M also notified Hull that the June 1951 agreement was terminated and cancelled. It is significant to note, however, that Ralph Hull never requested M and M to consent to the assignment to Union of his rights under that agreement and that he did not respond to inquiries from Tom Malarkey whether he wanted M and M to consent to the assignment.

No formal consideration was given by the M and M Board of Directors to the question of whether or not to consent to such assignment at any Board meeting in January 1952. The testimony was, however, that the Board had originally decided that it did not want Union as a "partner" under the June 1951 agreement, based upon the knowledge of various Board members of Wilson's reputation; that the Board had later been informed of the subsequent reports relating to Wilson's unsavory reputation, as well as his treatment of Hull; that by January 1952 the question of consent to the assignment was considered to be "more of an operating problem," but that members of the Board were

nevertheless kept informed of all developments by Robert Sabin, as attorney for M and M, so that "if anybody wanted to object they could."

Tom Malarkey also testified that insofar as he was concerned, as president of M and M, during the month of December 1951 and at all times thereafter (and after his investigation of Wilson in July and his conversations about Wilson with Hull's attorney in October), "Union was not a person which M and M could reasonably expect to carry out the terms of the June 16, 1951 agreement on the part of Ralph Hull." Robert Sabin, attorney for M and M also testified that after talking to various persons about Mr. Wilson and being told "in great detail how difficult and tricky Wilson was," among other things, it was his opinion that "Wilson was not a person you wanted to get into any complex deal with;" that the June 1951 agreement would require "joint logging operation" for the M and M tract (at least insofar as agreeing upon a logging program at the beginning of each year), as well as other problems requiring cooperation, such as agreeing upon right-of-way problems and upon routes for logging roads across the Hull tract with "decent grades" (all of which had an effect on the value of timber), and that while M and M was willing to buy logs from Wilson, that was as far as they wanted to go with him.

*Findings of Fact that M and M Acted Properly and in Good Faith.*

After hearing and considering the evidence the trial judge made several pages of specific and detailed findings of fact, including the following:

"The court finds that the letter presented to

Mr. Malarkey for his signature by A. K. Wilson (Exhibit 7) was presented at the last possible moment and in circumstances in which Mr. Malarkey was under substantial pressure. * * * At the time Mr. Malarkey was conscious of no inconsistency between his agreement with Union (Exhibit 7) and his agreement with Hull (Exhibit 8). * * * The court finds that Mr. Malarkey was, in all respects, acting in complete good faith.

"* * * * *

"The testimony of Tom Malarkey with respect to the circumstances under which the letter of agreement with Union was signed is believed by the court to be a truthful and accurate account. The court does not believe the testimony of A. K. and Myrtle Wilson to be trustworthy on this as well as other subjects.

"* * * * *

"The court finds that the proposition embodied in Exhibit 7 was presented to the M and M board of directors by Thomas Malarkey with his favorable recommendation. * * *

"The court finds that the board of directors considered and rejected the proposition embodied in Exhibit 7. * * *

"* * * * *

"Hull's agreement with M and M was one which provided for the joint liquidation of timber * * * on the M and M tract. It was contemplated that the logging of the M and M tract timber would not commence until 1956, and that logging would take approximately 15 years. Under certain circumstances Hull was to have the right to enter upon the M and M tract and engage in separate logging. The precise logging program to be undertaken from year to year was to be agreed between Hull and M and M. It was understood and agreed that the performance of the contract would involve substantial elements of mutual trust and confidence, and that M and M had entered into the contract

because of its trust and confidence in the ability and integrity of Ralph Hull.

"\* \* \* \* \*

"The court finds that on or about January 9, 1952, M and M did not have confidence in Union. The court finds that this lack of confidence was due to M and M's knowledge of Union's dealings with Ralph Hull and of A. K. Wilson's reputation as a businessman. The court also finds that due primarily to the Hull-Union dealings, M and M did not reasonably expect Union to carry out the terms of the June 16 agreement as a successor to Hull.

"\* \* \* \* \*

"The court finds that Union is not in fact an assignee in whom a reasonably prudent businessman would have confidence or could reasonably expect to carry out the terms of the June 16 agreement to be kept and performed by Ralph Hull. \* \* \*"

■ We have carefully read the lengthy testimony and have examined the hundreds of exhibits offered by the parties in this long and bitterly contested trial. Regardless of whether or not we agree with *all* of the findings of fact by the trial court, we conclude that there was ample evidence to support the foregoing findings of fact by the trial judge, who had the advantage of being able to observe the demeanor of the witnesses, and we agree with those findings.

It is contended by plaintiffs, however, that in determining whether M and M improperly refused to give such consent this court must reject what is referred to by plaintiffs as the reliance by the trial court upon "defendants' contention that the June 16, 1951, agreement provided for both objective and subjective standards," upon the ground that such a double

standard is "self-contradictory, unworkable and invalid." Thus, plaintiffs contend that:

> "The only standard consistent with M and M's promise not to 'unreasonably withhold' its consent to an assignment is whether M and M's refusal to give its consent on this occasion was reasonable in light of the information which it considered and acted upon."

■ The question of the reasonableness or unreasonableness of M and M's actions in withholding its consent to the assignment is essentially a question of fact. It may be, under the evidence of this case, that a trier of the facts might have held that it would have been unreasonable for M and M to refuse to consent to an assignment to Union of a simple contract under which Union would be required to do no more than deliver and sell logs to M and M, for payment by it at an agreed price. We believe, however, that there was ample evidence to support the finding of fact by the trial court that the reputation of Wilson and his treatment of Hull were such that it was not unreasonable for M and M, in the light of such information, to refuse to consent to an assignment to Union of a long term contract of the nature and complexity of the agreement of June 16, 1951. We also agree with that finding of fact, based upon our "de novo" review of the record in this case, particularly in view of the provisions of that contract which expressly recognize that the trust and confidence of M and M in the integrity, as well as the ability, of Ralph Hull was an essential element of that agreement. Indeed, we believe that whether the proper test to be applied in this case is the test proposed by plaintiffs or by defendants, the same result must follow under the facts in this case.

Plaintiffs concede that if the standard proposed by it was satisfied the fact that it was also to the self-interest of M and M to refuse to consent to the assignment would not invalidate such a refusal. Plaintiffs also concede that in order to prove that M and M acted improperly in refusing such consent it was necessary for plaintiffs to prove more than that M and M acted out of self-interest, but that it acted in bad faith.

Plaintiffs contend, however, that if M and M acted in bad faith in refusing such consent, as they contend to be the fact, it is no defense that M and M also acted in self-interest or that it might have had grounds under which it *could* reasonably have refused consent and that to hold otherwise would violate the rule of equity that one will not be permitted to profit from his own wrongful act. To the same effect, plaintiffs contend that the contract requirement under which M and M promised not to unreasonably withhold its consent necessarily implied that M and M would honestly and in good faith consider and pass judgment on any prospective assignee.

After carefully reviewing the record in this case, however, we conclude that while the evidence offered by plaintiffs was sufficient to prove that M and M acted out of self-interest in refusing to consent to the assignment to Union, the evidence was not sufficient to prove that in doing so M and M acted in bad faith or that it did not honestly and in good faith consider and pass judgment upon Union as a prospective assignee, in view of M and M's knowledge of Wilson's course of conduct in dealing with Hull and of his unsavory reputation in the lumber industry as a litigious and unreliable person.

II  *Assignment of Hull's Right to Buy Redwood Timber, as well as Hull's Duties under June 1951 Agreement, were both Subject to Restrictions in that Agreement.*

Despite the fact that Union devoted the bulk of its brief and argument to a discussion of its contention that M and M acted improperly and in bad faith in refusing to consent to an assignment by Hull to Union, as provided by the December agreement, Union also contends that "the assignment did not require M and M's consent."

Thus, Union contends that the restrictions on assignability in the June agreement "affected only a possible delegation by Ralph Hull of his contractual duties" and "did not prohibit an assignment of his rights." In support of that contention Union cites text authority for the general proposition that a contract provision that the contract "shall not be assignable should not be interpreted to forbid assignment of contract rights," as well as California cases holding that a contract restriction upon assignability "does not prevent an assignment of rights, such as money due or to become due under it." Union also contends that these contract restrictions did not "prohibit a delegation of Ralph Hull's duties" in the absence of a complete novation, since such a delegation by Hull to Union "would not relieve Ralph Hull * * * from responsibility for their performance."

■ Assuming, as plaintiffs seem to contend, that the interpretation of the June 1951 contract is controlled by California law, as we read the California cases the courts of that state are in accord with the general rule that where rights, as well as duties, are created by contract, provisions of such a contract which show an

intent that they shall not be assignable without consent will be given effect, even including the right to payment of money, such as under a promissory note with an express provision that the note shall not be assignable. See *Parkinson v. Caldwell*, 126 Cal App 2d 548, 272 P2d 934, 937 (1954), quoting from *La Rue v. Groezinger*, 84 Cal 281, 283, 24 P 42, 43 (1890).

In 1 Restatement, Contracts § 151, the following rule is stated: "A right may be subject to effective assignment unless * * * (c) the assignment is prohibited by the contract creating that right."

■ Also, when a bilateral contract forbids assignment, it is a matter of interpretation whether the parties intended that only the contract duties cannot be delegated, whether the contract rights also cannot be assigned or whether "both prohibitions are intended," as held by Justice Traynor in *Trubowitch v. Riverbank Canning Co.*, 30 Cal 2d 335, 182 P2d 182, 188 (1947), quoting from 2 Williston, Contracts (rev ed) 1217, § 422, (3d ed) 138. See also Johnson, Assignment of Contracts and Contract Proceeds, 12 Hastings L. J. 397, 403-404, and 35 Cal L. Rev 577, 579, 580.

■ Indeed, even in the absence of an express provision prohibiting or restricting assignment, rights or duties created by contract may not be assigned if they involve the peculiar fitness or ability of the person performing the contract or when the contract is made by reason of the trust and confidence placed by one party in the other party to the contract, with the result that the assignment of either such contract rights or duties would materially impair the nonassigning party's chance of obtaining the performance he expected. *Farmland Irrigation Co. v. Dopplmaier*, 48 Cal 2d 208, 308 P2d 732, 740, 741 (1957) citing 2 Williston, Con-

tracts (rev ed) 1177-1182, (3d ed) 20; 1 Restatement, Contracts § 151. See also *Simmons v. Zimmerman,* 144 Cal 256, 79 P 451 (1904).

The June 1951 agreement expressly provided that:

"It is understood that M and M is entering into this agreement because it has full trust and confidence in the integrity and ability of Ralph Hull, and accordingly it is agreed that this agreement may not be assigned without the prior written consent of M and M * * *."

The agreement also provided, among other things, that:

"The essence of this agreement is the sale by M and M to Ralph Hull of all the merchantable logs, except fir, produced in the harvesting of the M and M tract and the sale by Hull to M and M of all peelable fir logs developing from the harvesting of the merchantable timber on the Hull tract. * * *"

It was also provided by the agreement, among other things, that the parties were to agree at the beginning of each year upon a logging program for the M and M tract (which was contemplated to extend for a period of 15 years).

The agreement also provided that:

"Hull shall on demand of M and M give and grant to M and M through proper instruments any and all rights of way or easements of any kind and nature that it is capable of giving and granting on and across the Hull tract for the purpose of providing access to the M and M tract, and hereby and herein gives and grants to M and M the right to use any and all logging roads constructed or to be constructed by Hull on the Hull tract; * * *"

■ Upon reading the June 1951 agreement as a whole, and in the light of both the circumstances at that time

and the subsequent conduct of the parties, we conclude that it was the intention of the parties that neither the rights nor the duties of Ralph Hull or "Hull" under that contract, including the right to purchase the redwood, as well as the duties imposed under that agreement, were to be assigned without the consent of M and M.

## III  *Termination by M and M of June 1951 Agreement —Laches.*

It is next contended by Union that the trial court erred in holding that M and M had the right to terminate the June 1951 agreement.[9] Thus, Union contends that M and M did not have proper grounds for terminating the June 1951 agreement for various reasons.[10]

---

[9] That agreement provides that:

"* * * In the event that either party shall be in default in any one or more of the provisions of this agreement herein contained other than the payment of money or shall breach any covenant contained herein and such default or breach shall continue for thirty days after notice thereof to the party in default, then the party [not] in default may immediately cancel this agreement, and all the rights and privileges of the party in default under this agreement shall immediately cease and terminate. * * *"

[10] These reasons include the following, among others:

(1) The provisions of that agreement relating to the duty of Hull to sell fir peeler logs from the Hull tract to M and M were completely "severable" and "divisible" from the provisions of that agreement relating to the sale of redwood logs from the M and M tract by M and M to Hull in that such provisions involved separate subject matter, separate performance and seperate consideration. (2) It follows that even if, as a result of the December 1951 agreement, Hull was no longer able to deliver fir peeler logs from the Hull tract to M and M, this did not provide grounds under which M and M could terminate Hull's contract right to purchase redwood from the M and M tract. (3) In any event, the execution of the December 1951 agreement by Union and Hull was not a repudiation of Hull's principal obligation under the June agreement, which was

In response, it is contended by M and M that the execution by Hull and Union of the December 1951 agreement was a material breach of Hull's obligations under his June 1951 agreement, thus providing sufficient grounds for the termination of that agreement, for the various reasons.[7]

"simply to sell M and M fir peeler logs at market," because by the terms of the December 1951 agreement M and M was protected in the performance of that obligation in that not only was Hull still under obligation to perform his obligations under that agreement, but Union also agreed "to perform all of the duties and obligations of Hull" under the June agreement and thus guaranteed such performance, and (4) M and M refused to accept performance of the June 1951 agreement by refusing to accept delivery of fir peeler logs by Union from the Hull tract in accordance with terms of the June 1951 agreement. Based upon these contentions, it is urged by Union that even if the June 1951 agreement was not assigned to it, neither was that agreement terminated, but remained in effect.

[7] These include the following among others:

(1) While the existence of separate subject matter, performance and consideration are factors to be considered in determining whether contract provisions are "severable" or "divisible," the controlling criterion is the intention of the parties as determined both by a fair construction of the entire contract and also by the conduct of the parties. (2) Both a reading of the June 1951 agreement as a whole and a consideration of the circumstances and conduct of the parties support the finding of the trial court that it was intended to be a single, non-severable, bilateral agreement "the essence" of which was the sale by M and M of the redwood logs from the M and M tract to Hull in return for the sale by Hull to M and M of the fir peeler logs from the Hull tract. (3) In view of the fact that the June agreement was expressly based upon the special trust and confidence reposed by M and M in Hull, the December agreement was a material breach of the June agreement in that by its terms Hull agreed to assign his rights and duties under the June agreement to a person who he knew to be not only unacceptable to M and M, but also to be a person "who he did not believe to be a reasonable assignee." (4) By the terms of the December 1951 agreement Hull's interests in the timber on the Hull tract were terminated, with the result that Hull divested himself of the capacity to perform his contract obliga-

While these contentions by M and M appear to adequately answer plaintiff's contentions that M and M did not have proper grounds to terminate the June 1951 agreement, and while the trial court expressly found that M and M had proper grounds to terminate that agreement, it would also appear that even if the June agreement was not properly terminated, but remained in effect, the necessary result would be that Hull, rather than Union, would then have retained the right to purchase the redwood timber on the M and M tract.

But any such claim by Hull has long since been barred by laches. This follows because Hull had been advised by competent counsel as early as 1956 that he had no such right for the reason that the contract had been properly terminated and he then waited until the filing of his answer in this case in November 1967 before making any such claim in this or any other proceeding.

In our view, such a delay of nearly 12 years was a delay for an unreasonable period of time, under the circumstances of this case. In addition, M and M

tions not only to deliver fir peeler logs to M and M from that tract, but also to grant to M and M rights-of-way for access across the Hull tract to the M and M tract, as also provided by the terms of the June agreement to facilitate the logging of the M and M tract. (5) The December 1951 agreement did not confer an unconditional right to compel Union to perform these pre-existing obligations of Hull under the June 1951 agreement, since Union agreed to perform them only upon the condition that M and M consent to the assignment and otherwise Union, at its option, had the right to discontinue such performance; (6) the fact that some fir peeler logs from the Hull tract were tendered to M and M by Union was not a sufficient tender of performance and did not require M and M to accept such logs, in view of that express reservation by Union of the right to terminate such performance unless M and M consented to the assignment, which M and M was not required to do, for reasons previously stated.

and Simpson, as its successor, were prejudiced by that delay in that, among other things, Simpson began in 1957 to log the redwood timber on the M and M tract and the value of that timber substantially increased during that period. See *Lulay v. Lulay*, 247 Or 497, 501, 429 P2d 802 (1967) and *Aspinwall v. Ryan*, 190 Or 530, 540, 226 P2d 814 (1951).

Indeed, in view of the delay by Union until 1961 before filing the original complaint in this case, after filing two abortive proceedings in California, the claim of Union may also well be barred by laches. Because, however, of our decision rejecting, on its merits, the claim of Union that it acquired Hull's right to purchase the redwood timber as a result of its December 1951 agreement with Hull and because of what it contends to be M and M's unreasonable and bad faith refusal to consent to Hull's assignment of that right to Union, it is not necessary to decide whether Union's claim is also barred by laches.

It follows, for all of these reasons, that the judgment and decree of the trial court in favor of defendants M and M and Simpson must be affirmed.

It should be noted that present counsel for both plaintiffs and for defendant Ralph Hull, who most ably represented their clients on the trial and appeal of this case, were not the same as the counsel who represented such parties during the original transactions and during the two previous proceedings filed in California on behalf of these same plaintiffs.

Affirmed, with costs to defendants M and M and Simpson against plaintiffs, but with no costs either to or against defendant Hull.