No. 13473

IN THE SUPREME COURT OF THE STATE OF MONTANA

1977

---

BELGRADE STATE BANK,
A Montana Corporation,

        Plaintiff and Respondent,

  -vs-

HERBERT EARL SWAINSON, individually, and
as GUARDIAN of the ESTATE OF WANDA K. SWAINSON,
WESTERN SURETY COMPANY, a corporation, MRS. ROBERT
BLACK, JAMES HUNT and LARRY JORDAN,

        Defendants and Appellants.

---

Appeal from:  District Court of the Sixth Judicial District,
            Honorable Nat Allen, Judge presiding.

Counsel of Record:

    For Appellants:

        Huppert and Swindlehurst, Livingston, Montana
        Arnold Huppert argued, Livingston, Montana
        Swandal & Douglass, Livingston, Montana
        Kent Douglass argued, Livingston, Montana
        Byron L. Robb argued, Livingston, Montana

    For Respondent:

        Stephen Clarke Mackey argued, Billings, Montana
        Towe, Neely and Ball, Billings, Montana

---

            Submitted:  March 22, 1977

            Decided: MAY 12 1977

Filed: MAY 12 1977

_Thomas J. Kearney_
            Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Defendants appeal from the judgment of the district court, Park County, for plaintiff Belgrade State Bank.

In 1966 Herbert Earl Swainson (Bert) was appointed guardian of his minor daughter's estate and proceeded to manage the assets, which the daughter had inherited from her mother. A part of the estate was used to purchase a ranch near Livingston, Montana and the rest was put in certificates of deposit. The district court judge who presided over the guardianship proceedings allowed the purchase of the ranch as an investment but he made it clear from the outset that in no way would he allow the guardianship to become involved in a ranching operation.

In 1968, Bert wanted to run a cattle operation on the ranch but he lacked funds with which to purchase cattle and equipment. He approached his brother Jack, who was the executive vice-president of the Belgrade State Bank, to apply for a loan. Bert had already borrowed in excess of his personal borrowing limit. It was suggested it would look better to the bank examiners if the loan was made to the estate or in the name of the estate. After some negotiations with the bank and the judge, an agreement was reached. A petition was filed in the guardianship proceedings stating:

> "That your petitioner made arrangements with a
> financial institution to loan him sufficient money
> for the operation expense of said ranch, as well as
> the purchase of cattle, and said financial institution
> is agreeable to securing said loans with only the cattle
> or necessary equipment that may be purchased from said
> loan funds; that the financial institution has advised
> your petitioner that they are willing to enter into an
> Agreement that, in the event of default in the payment
> of said obligations, that they will only look to the

- 2 -

security pledged as collateral for said loans, and will in no way seek any deficiency judgment, in the event of foreclosure."

The court required a letter from the bank agreeing to this arrangement and that letter states:

"Belgrade, Montana
April 21, 1969

"The Honorable Jack D. Shanstrom
 District Judge
 Park County Courthouse
 Livingston, Montana

"Dear Judge Shanstrom:

"It is my understanding that you have signed an Order authorizing Herbert Earl Swainson, as Guardian of the Person and Estate of Wanda K. Swainson, to borrow money from our institution for the purchase of cattle and operating expenses.

"It is my further understanding that your Order is conditioned upon us agreeing that, in the event of default and foreclosure of our mortgage, that the extent of the relief to which we would be entitled is to recover back our security, not to seek any deficiency judgment against the other guardianship assets.

"We are willing to do this, with the exception of the fact that there is certain farm machinery that Mr. Swainson has acquired through loans that would also be pledged as security. This equipment was not purchased with guardianship funds but through loans with our institution.

"Very truly  yours,
BELGRADE STATE BANK
By John W. Swainson
     Executive Vice President."

The court's order reads in pertinent part:

"Upon reading and filing the verified Petition of HERBERT EARL SWAINSON, Guardian of the Person and Estate of WANDA K. SWAINSON, a Minor, and it appearing from said Petition that it is to the best interests of the minor ward that the Guardian be permitted to borrow moneys to purchase cattle and to operate said ranching business; and

"IT APPEARING therefrom that a financial institution is willing to loan money for said purposes to the Guardian, and has agreed to limit their right of recovery in the event of default on said notes, to repossession of the secured property, and not to seek a deficiency against the guardianship funds;

- 3 -

"NOW, THEREFORE, IT IS HEREBY ORDERED That the said Guardian, Herbert Earl Swainson, may secure loans for the purchase of cattle and to secure general operating expenses for the ranch owned by said minor ward, conditioned upon said financial institution delivering a letter to this Court, by a qualified officer of said institution, that in the event of default on said notes, they will only repossess the property secured by said Chattel Mortgages, and will not seek a deficiency judgment against any of the other guardianship assets.

"Dated: This 23rd day of April, 1969."

A substantial amount of money was loaned and over two hundred head of cattle were purchased.

In late October 1969, Bert Swainson entered into a cattle leasing agreement with one Robert Black. By the terms of this agreement, Bert Swainson would care for 87 head of Black's cattle on the ranch and would receive 70% of the increase for doing this. The agreement provided that all the calves be branded with the Black brand; that Black pay all taxes on the cattle; and it set the time for the division of the increase as the time of the sale of the increase. The agreement further allowed Black to select replacement heifers to be credited against his 30% share of the increase.

In July 1970, Ed Towe, president of the Belgrade State Bank (Bank) had some doubts that all the cattle purchased were on the ranch so he made a visual inspection. While he was making the inspection, he secured an oral accounting of the number of cattle from Bert Swainson, which Towe recorded on a sheet of Swainson letterhead paper. The list included 230 head of cows, 83 head of share cows, 185 calves branded with the estate brand and 56 calves of the leased cows which Swainson said were due him under the lease agreement.

After this visit the Bank made two smaller loans for some equipment and to purchase two Charolais bulls. In mid-August, and again in mid-September, the Bank loaned $4,000 on notes payable on demand. Less than a month after the last $4,000 loan, on October 13, 1970 the Bank invoked the insecurity clause of its security agreement and took possession of all the estate's cattle leaving all the lease cows and their calves on the Swainson ranch.

During the summer prior to the seizing of the cattle, the Bank obtained an assignment from Bert Swainson of his interest in the lease cattle and had attempted to get a consent from Mr. Black. The Black-Swainson lease agreement contained a non-assignability clause. No consent was ever given by either Mr. or Mrs. Black.

Shortly after the Bank cattle had been taken from the ranch, Larry Jordan, a bulk gasoline distributor and a creditor of the ranching operation, drove by the ranch on his distribution route and noticed the lease cattle still on the land. Jordan approached another creditor of the ranching operation, James Hunt who owned a local lumber yard, and they approached Bert Swainson and offered to buy a part of his interest in the increase of the Black cattle, so that he could pay his debts to them. After some negotiation a sale was arranged. Mrs. Black, whose husband died prior to the Bank seizing the Swainson cattle, transferred 36 calves, all branded with her brand, to Hunt and Jordan, who gave her a check for the balance of the purchase price over what was owed to them. Mrs. Black had selected heifer calves as replacements and after their weight was credited toward her 30% of the increase due under the contract and apparently after deducting

- 5 -

the amount due her because the death loss exceeded that allowed under the contract, she paid Bert Swainson the balance due, as he requested, in cash.

In May 1971, the Bank sent a notice of sale of the collateral to the guardian and the cattle were sold leaving a substantial amount still owing on the Bank's loans to the estate. On October 16, 1972, the Bank filed this action against the guardian, the surety company, and Mrs. Black. On December 3, 1973, the complaint was amended joining Hunt and Jordan as defendants.

Due to the multiple defendants, with conflicting interests, we are faced with numerous issues. In view of the fact we find several issues controlling and dispositive of various defendants, we set forth three issues:

1) This issue is directed at the court's failure to rule on the motions to dismiss made at the close of plaintiff's case and again at the close of defendants' case.

2) This raises the question of whether or not Bert Swainson was acting for the guardianship when he entered into the agreement of October 31, 1969, with the Bank.

3) Issue three concerns attorney fees.

Issue 1). This concerns the trial court's failure to grant the defendants' motions to dismiss, which were properly made (1) at the close of plaintiff's case, when the trial judge took them under advisement, and (2) at the close of all testimony.

Our first consideration is to the motions to dismiss of defendants Black, James Hunt and Larry Jordan. We find the trial court erred in not granting their motions to dismiss.

The security agreements dated February 14, 1969 and December 17, 1969, executed by Bert Swainson as guardian of the estate, each contained language stating that after-acquired livestock would be subject to the security agreement. The Bank filed a standard financing statement with the clerk and recorder of Park County. The debtor identified in the two documents filed was the "Wanda Swainson Ranch Estate", no additional debtor was named, no mention was made that after-acquired property was considered collateral.

A year after the initial loan to the estate Bert Swainson, individually, entered into the Black contract to care, feed and breed the Black cattle and in return he was to receive 70% of the calf crop. No mention was made of the relationship he had with the estate. All testimony indicated this contract was entered by him as an individual, and all parties so understood that agreement.

While Towe testified Bert told him the share cattle were to be considered collateral, this was denied by Bert. There is no testimony to indicate Bert told either the Blacks, Hunt or Jordan of any claim the Bank had to the calves. The Bank's claim rests entirely on the alleged statement of Bert Swainson and Towe testified:

> "* * * as far as we were concerned I didn't even know about the [Black-Swainson] contract and we weren't relying on that contract anyhow. The cattle were purported to us to be part of the collateral that we had under our security agreement. * * *"

We find no reliable evidence that any measures were taken by the Bank to notify Mrs. Black of the alleged interest claimed by the Bank. The Bank tried to supply, through the testimony of Jack Swainson, a conversation with Mr. Black. Mr. Black died

several months before repossession and Swainson admitted Black
did not sign an assignment he had prepared for the Bank.  At the
time the Bank repossessed its cattle, Jack Swainson called Mrs.
Black and made no mention of any interest the Bank had in the share
calves.  On October 13, 1970, the Bank repossessed its cattle
from the ranch.  Mrs. Black's cows and calves were not taken,
nor was the sheriff notified of any interest that the Bank claimed.
The calves remained on the Swainson ranch for two weeks when,
on October 27, 1970, Mrs. Black and Bert Swainson made a division
of the calves.  At all times the cows and calves had the Black's
brand on them.

It was not until the division of the calves that Jordan
and Hunt came onto the scene in an effort to collect debts owed
them by Bert Swainson.  Swainson directed Mrs. Black to give a
bill of sale to Hunt and Jordan, who purchased 36 calves,
credited Swainson's account and gave him the remainder.  Some
two years later, on October 16, 1972, suit was filed against Mrs.
Black alleging conversion of 56 calves.

Here, the Bank went to considerable effort in seeking and
getting the approval of the court for the loan to the estate.  No
such efforts were made by either the Blacks or Swainson in regard
to their contract.  The court was unaware of the Black contract
until litigation began.  The contract between the Blacks and Bert
Swainson contained a provision prohibiting assignment or hypothe-
cation of the contract by either party, without the written con-
sent of the other.  The contract is valid and the Bank is estopped
from attacking its validity.  In addition, Swainson having failed
to get any assignment from Black, the Bank dealt with Bert Swain-
son at its own risk.  Pasadena Investment Co. v. Pasadena Air

Products Inc., 234 F.Supp. 128; Parkinson v. Caldwell, 126 C.A.2d 548, 272 P.2d 934; Union Bond & Trust Co. v. M & M Wood Working Co., 256 Or. 384, 474 P.2d 339, 352; 3 Williston on Contracts 3rd. ed., §422; 12 Hastings Law Journal 397, 403.

In finding that the court erred in not granting Mrs. Black's motion to dismiss, it follows that Hunt and Jordan's motion should also have been granted because Mrs. Black had good title to transfer.

We next consider whether or not the court erred in not granting the motion to dismiss Western Surety Company, the bonding company for the Estate of Wanda K. Swainson. Defendant surety company argues it was not a proper party to the action, and neither the complaint nor proof sustains a claim upon which relief can be granted. Further, that the bond issued is to indemnify the ward against defalcations by the guardian; and until there is a loss by the guardianship estate there can be no liability on the bond. Burns v. Massachusetts Bonding & Ins. Co., 62 C.A.2d 962, 146 P.2d 24.

Western Surety Company argues there can be no liability against the surety company for these reasons:

1) The surety company is not liable because the guardianship suffered no loss;

2) The court's order approving the loan transaction is illegal under Montana's guardianship law; and

3) The court's order approving the loan transaction bars any recovery against it by the Bank.

We concur with Western's argument that until there is a defalcation by the guardian, and a loss to the ward, there can be no liability on the part of the surety company.

As to the second point of the argument that the transaction was illegal, we do not concur. Here the court approved only a loan to Swainson, specifically ordering that the guardianship would in no way be liable for any losses. The court, at the request of the Bank and Bert Swainson, made a specific effort to protect the guardianship assets and the parties completely understood the loan and its limits.

In addition, under Montana's guardianship statutes and case law, a guardian has no power to borrow money from or to encumber property of his ward without prior approval of the court. Davidson v. Wampler, 29 Mont. 61, 74 P. 82; Alexander v. Windsor, 107 Mont. 152, 81 P.2d 685; Mitchell v. McDonald, 114 Mont. 292, 136 P.2d 536; Anno. Guardian's Unauthorized Acts, 130 ALR 113-116; 39 Am Jur 2d, Guardian and Ward, §§ 91,99; 39 C.J.S. Guardian and Ward, § 76.

In the instant case, the Bank was required to file a covenant not to sue against the estate, before getting the court's permission to make the loan. There has been no loss to the estate nor could there be under the covenant. The Bank's business was with Bert Swainson personally for the agreement made by the Bank with the court absolves the estate of any liability and the surety is not liable on the bond. Sago v. Ashford, 145 Colo. 289 /;Western Machinery Co. v. Northwest Improve. Co., 254 F.2d 453.
358 P.2d 599

We note here that the Bank at all times admitted it had no claim against the assets of the estate in view of the court's order, but if the judgment of the trial court prevailed there was no assurance that the bonding company would not proceed against the guardianship for the $10,000 of the bond.

- 10 -

The second issue is whether or not Bert Swainson could in any way encumber the guardianship in making this agreement with the Bank. All the evidence clearly shows the entire transaction was between the Bank and Bert Swainson. The guardianship became involved only as a paper front because of banking requirements. The guardianship estate lent its name so the Bank could make additional loans to Bert Swainson after he had exceeded his borrowing capacity. It did so knowingly after the district judge supervising the guardianship directed that there was to be no liability of any kind against the guardianship. Considering the facts here, where the Bank was in the unique position with relation to its loan to Bert Swainson, it cannot shield itself by looking to anyone but Bert Swainson.

The third issue concerns attorney fees and needs little discussion in view of our holding in this case. The trial court erred in granting attorney fees to the Bank against each defendant.

The Bank argues that the provisions of section 87A-9-201, R.C.M. 1947, recognize attorney fees in the collection of any secured obligations against not only the borrower but purchasers of collateral and other creditors. Section 93-8613, R.C.M. 1947, provides for counsel fees on foreclosures. Answering defendants' argument that attorney fees are reciprocal under section 93-8601.1, R.C.M. 1947, the Bank argues that due to the dates on the security interests the provisions in the statute are not applicable because the statute allowing reciprocal rights was passed after the security agreements were signed.

We find no merit to the Bank's argument. Section 93-8613 is applicable solely to foreclosure actions or to security interests in personal property. Except for the action against the estate,

the complaint alleges a tortious conversion against Black, Hunt and Jordon. The section as to these defendants is not applicable.

All defendants, except Herbert Earl Swainson, are entitled to attorney fees by virtue of section 93-8601.1, R.C.M. 1947. The statute is procedural in nature and applies to actions commenced after its effective date, even though such action arose out of events occurring prior thereto. Crncevich v. Georgetown Rec. Corp., 168 Mont. 113, 541 P.2d 56, 32 St.Rep. 963; Anno. 18 ALR3d 733, 736, 740.

The judgment of the district court against Herbert Earl Swainson individually is affirmed, but reversed as to all other defendants. The cause is remanded with directions to fix attorney fees for defendants.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices.